# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JUSTYNA JENSEN,<br>    Plaintiff,<br><br>v.<br><br>RHODE ISLAND CANNABIS<br>CONTROL COMMISSION and<br>KIMBERLY AHEARN IN HER<br>OFFICIAL CAPACITY,<br>    Defendants. | C.A. No. 24-cv-191-MRD-AEM |
| JOHN KENNEY,<br>    Plaintiff,<br><br>v.<br><br>RHODE ISLAND CANNABIS<br>CONTROL COMMISSION and<br>KIMBERLY AHEARN IN HER<br>OFFICIAL CAPACITY,<br>    Defendants. | C.A. No. 24-cv-252-MRD-AEM |
| JUSTIN PALMORE,<br>    Plaintiff,<br><br>v.<br><br>RHODE ISLAND CANNABIS<br>CONTROL COMMISSION and LAYI<br>ODUYINGBO IN HIS OFFICIAL<br>CAPACITY,<br>    Defendants. | C.A. No. 25-cv-622-MRD-AEM |

## MEMORANDUM AND ORDER

Melissa R. DuBose, United States District Judge.

The cases before this Court implicate the hazy area between the United States' federal prohibition on marijuana and the State of Rhode Island's emerging recreational marijuana market. In 2025, the Rhode Island General Assembly passed the Rhode Island Cannabis Act[1] ("Act"), which, among other things, enables the Cannabis Control Commission ("CCC") to issue twenty-four licenses for recreational marijuana dispensaries. After the Act became law, the CCC promulgated rules and regulations detailing how to qualify for one of the licenses. Three individuals challenge the constitutionality of the Act, alleging it violates the Dormant Commerce Clause and the Equal Protection Clause. Each of these Plaintiffs contend that the Act excludes them from the Rhode Island recreational cannabis market and that the Act is unconstitutional because it expressly favors in-state residents over out-of-state residents. The CCC disagrees, arguing that the Plaintiffs lack standing and that the Act does not run afoul of either the Dormant Commerce Clause or Equal Protection Clause. The Court held a joint hearing on Plaintiffs' motions for preliminary injunction and the Defendants' motion to dismiss.[2] For the reasons discussed below,

---

[1] R.I. Gen. Laws § 21-28.11-1 to -32.

[2] At this joint hearing, the Court heard argument on the following ripe motions and resolves all of them in this Memorandum & Order: (1) *Justyna Jensen v. Rhode Island Cannabis Control Commission, et al.*, 24-cv-191, Plaintiff's motion for preliminary injunction (ECF No. 9) and Defendants' motion to dismiss (ECF No. 13); (2) *John Kenney v. Rhode Island Cannabis Control Commission, et al.*, 24-cv-252, Plaintiff's motion for preliminary injunction (ECF No. 34) and Defendants' motion to

the Court GRANTS the Plaintiffs' motions for preliminary injunction and DENIES the Defendants' motions to dismiss.

## I.    BACKGROUND

### A.    Rhode Island Cannabis Act

The Rhode Island General Assembly passed the Act on May 25, 2022, which established the CCC "to oversee the regulation, licensing and control of adult use and medical cannabis and [eventually] to exercise primary responsibility to oversee the regulation, licensing and control of all cannabis and marijuana use to include medical marijuana." R.I. Gen. Laws § 21-28.11-4(a). The CCC's powers and duties include "(1) [a]dopt[ing], amend[ing] or repeal[ing] rules and regulations for the implementation, administration and enforcement of [the Act] [and] (2) [d]etermin[ing] which applicants shall be awarded licenses[.]" Section 21.28.11-5(a)(1), (2). The Act gives the CCC the authority to "grant twenty-four (24) retail licenses … after issuance of the final rules and regulations," which the CCC promulgated on May 1, 2025. Section 21-28.11-10.2(a). "Of the four (4) retail licenses in each [of the six] geographic zone[s] … [o]ne shall be reserved for a social equity applicant." Section 21-28.11-10.2(a)(3)(ii).

To qualify for a license under the Act, "an applicant shall satisfy all qualifications established by the commission" including being a Rhode Island resident. Section 21-28.11-10.2(b)(2). The Act defines an applicant as "a Rhode

---

dismiss (ECF No. 19); and (3) *Justin Palmore v. Rhode Island Cannabis Control Commission et al.*, 25-cv-622, Defendants' motion to dismiss (ECF No. 10).

Island resident or a business entity with a principal place of business located in Rhode Island to include, but not limited to, a corporation, limited liability company, limited liability partnership or partnership, and in which fifty-one percent (51%) of the equity in the business entity is owned by residents of Rhode Island." Section 21-28.11-3(3). In addition to defining applicant, the Act specifically defines "social equity applicant" as

> [A]n applicant that has been disproportionately impacted by criminal enforcement of marijuana laws, including individuals convicted of nonviolent marijuana offenses, immediate family members of individuals convicted of nonviolent marijuana offenses and individuals who have resided in disproportionately impacted areas for at least five (5) of the last ten (10) years.

Section 21-28.11-3(39). Social equity applicants must meet at least one of the following criteria:

> (i) An applicant with at least fifty-one percent (51%) ownership and control by one or more individuals who have resided for at least five (5) of the preceding ten (10) years in a disproportionately impacted area.
>
> (ii) An applicant with at least fifty-one percent (51%) ownership and control by one or more individuals who:
>
>> (A) Have been arrested for, convicted of, or adjudicated delinquent for any offense that is eligible for expungement under this chapter; or
>> (B) Is a member of an impacted family.
>
> (iii) For applicants with a minimum of ten (10) full-time employees, an applicant with at least fifty-one percent (51%) of current employees who:
>
>> (A) Currently reside in a disproportionately impacted area; or
>> (B) Have been arrested for, convicted of, or adjudicated delinquent for any offense that is eligible for expungement under this chapter or is a member of an impacted family.

4

(iv) Can demonstrate significant past experience in or business practices that promote economic empowerment in disproportionally impacted areas.

(v) Had income which does not exceed four hundred percent (400%) of the median income, as defined by the commission, in a disproportionally impacted area for at least five (5) of the past ten (10) years.

*Id.* Embedded within the social equity applicant definition and criteria are references to "disproportionately impacted area" and "member of an impacted family." The Act defines disproportionately impacted area as "a census tract or comparable geographic area that satisfies at least one of the following criteria as determined by the commission, that":

(i) The area has a poverty rate of at least twenty percent (20%) according to the latest federal decennial census;

(ii) Seventy-five percent (75%) or more of the children in the area participate in the federal free lunch program according to reported statistics from the Rhode Island board of education;

(iii) At least twenty percent (20%) of the households in the area receive assistance under the Supplemental Nutrition Assistance Program (SNAP);

(iv) The area has an average unemployment rate, as determined by the Rhode Island department of labor and training, that is more than one hundred twenty percent (120%) of the national unemployment average, as determined by the United States Department of Labor, for a period of at least two (2) consecutive calendar years preceding the date of the application; or

(v)
  (A) The area has disproportionately high rates of arrest, conviction, and incarceration related to the sale, possession, use, cultivation, manufacture, or transportation of cannabis in comparison to other communities and localities in the state; or
  (B) The area has a history of arrests, convictions, and other law enforcement practices in a certain geographic area, such as, but not limited to, precincts, zip codes, neighborhoods, and political

5

> subdivisions, reflecting a disparate enforcement of cannabis prohibition during a certain time period, when compared to the remainder of the state.

> (vi) The commission shall, with recommendations from the cannabis advisory board and the chief equity officer, issue guidelines to determine how to assess which communities have been disproportionately impacted and how to assess if someone is a member of a community disproportionately impacted.

Section 21-28.11-3(23).  Under the Act, "[m]ember of an impacted family" is defined as

> [A]n individual who has a parent, legal guardian, child, spouse, or dependent, or was a dependent of an individual who, prior to the effective date of this chapter, was arrested for, charged with, convicted of, or adjudicated delinquent for any offense that is eligible for expungement under this chapter.

Section 21-28.11-3(34).

The definitions of "disproportionately impacted area" and "member of an impacted area" also refer to "any offense that is eligible for expungement under this chapter."  Expungement of marijuana records is governed by R.I. Gen. Laws § 12-1.3-5, which provides that "[a]ny person with a prior civil violation, misdemeanor or felony conviction for possession only of a marijuana offense that has been decriminalized subsequent to the date of conviction shall be entitled to have the civil violation or criminal conviction automatically expunged."  As Plaintiff Jensen points out, "Rhode Island does not have authority to expunge convictions from other states, nor do the statutes purport to do so.  Thus, only persons with Rhode Island convictions

can qualify for Social Equity Applicant status under the conviction prong of the qualifications."[3] Dkt. 191, ECF No. 1 ¶ 23.

### B.    The Three Prospective Applicants

With the relevant portions of the Act explained, the Court now moves on to discuss each of the three Plaintiffs and why they purport to be excluded from applying for one of the twenty-four recreational cannabis licenses that the CCC may issue later this year.

First is Justyna Jensen, a citizen of California who intends to apply for a recreational cannabis license "through a company in which she will own at least 51%." Dkt. 191, ECF No. 1 ¶¶ 26–27.  Ms. Jensen has never lived in Rhode Island or a disproportionately impacted area, is not a member of an impacted family, and "has never been arrested for, convicted of, or adjudicated delinquent for any offense that is eligible for expungement under Rhode Island law." *Id.* ¶ 28.  She argues that she is excluded from obtaining a general license or a social equity license because under the statute, she does not qualify. *Id.* ¶¶ 27–28.  Based on these allegations, Ms. Jensen brings two claims pursuant to 42 U.S.C. § 1983: (1) violation of the Dormant Commerce Clause and (2) violation of the Equal Protection Clause.  She seeks declaratory relief pursuant to 28 U.S.C. § 2201. *Id.* ¶¶ 29–46.

---

[3] Collectively, R.I. Gen. Laws § 21-28.11-10.2(b)(2), § 21-28.11-11-3(3),  § 21-28.11-11-3(23), § 21-28.11-11-3(34), § 21-28.11-11-3(39) and Regulations 560-RICR-10-10-1.11(b)(1)(e)(1) and 560 RICR-10-10-1.11(b)(1)(e)(2) will be referred to as the "Challenged Provisions."

Second is John Kenney, a citizen of Florida who has applied for a recreational cannabis license. Dkt. 252, ECF Nos. 1 ¶ 1, 36-1 ¶ 23. Mr. Kenney has never lived in Rhode Island, nor does he have any interest in a "business entity with a principal place of business located in Rhode Island." Dkt. 252, ECF No. 1 ¶¶ 16–17. He claims to be harmed by the residency requirement "because such provisions target [him] as a non-resident, preventing [him] from owning or having a majority interest in any License, and, thus, severely limits Plaintiff's economic opportunities in Rhode Island's cannabis industry." *Id.* ¶ 26. Based on these facts, Mr. Kenney asserts a claim pursuant to 42 U.S.C. § 1983 that the Act violates the Dormant Commerce Clause, and he also seeks declaratory relief pursuant to 28 U.S.C. § 2201. *Id.* ¶¶ 21–35.

Lastly, Justin Palmore is a citizen of California who has never lived in Rhode Island. Dkt. 622, ECF No. 1 ¶ 34. He claims that the "unconstitutional Rhode Island requirements" exclude him from meeting the requirements for a social equity license. *Id.* ¶ 35. Mr. Palmore states that "he lived in a disproportionately impacted area for at least five of the ten years before Rhode Island opened the social equity status verification period," but that his disproportionately impacted area was in Los Angeles, California.[4] *Id.* ¶ 36. He also states that he was arrested and convicted of a cannabis crime in California, but that the California conviction would be eligible for expungement if it occurred in Rhode Island. *Id.* ¶ 37. Lastly, Mr. Palmore explains

---

[4] Mr. Palmore notes that he "lived in an area of Los Angeles that was designated as a disproportionately impacted area for the Los Angeles cannabis licensing program." *Id.* ¶ 36.

that he has a low income and that "[f]or at least five of the last ten years, he earned less than 400% of the median income of the zip code where he lives[,]" which is another reason he may qualify for a social equity license. *Id.* ¶ 38. Mr. Palmore requested social equity status verification on September 23, 2025, and the Defendants rejected that application on November 14, 2025. *Id.* ¶ 39. Based on these allegations, Mr. Palmore brings two claims pursuant to 42 U.S.C. § 1983: (1) violation of the Dormant Commerce Clause and (2) violation of the Equal Protection Clause. He seeks declaratory relief pursuant to 28 U.S.C. § 2201. *Id.* ¶¶ 40–56.

## II.    LEGAL STANDARDS

### A.    Motion for Preliminary Injunction

"To be granted a preliminary injunction, a plaintiff 'must establish' that: (1) it is 'likely to succeed on the merits;' (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief;' (3) 'the balance of equities tips in [its] favor;' and (4) 'an injunction is in the public interest.'" *Doe v. Trump*, 157 F.4th 36, 46 (1st Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The third and fourth factors merge when the Government is the opposing party. *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).

### B.    Motion to Dismiss

"When a court is confronted with motions to dismiss under both [Federal] Rules [of Civil Procedure] 12(b)(1) and 12(b)(6), it ordinarily ought to decide the former before broaching the latter." *Deniz v. Mun. of Guaynabo*, 285 F.3d 142, 149 (1st Cir. 2002) (citations omitted). Rule 12(b)(1) governs dismissal for lack of subject matter

jurisdiction.  When considering a Rule 12(b)(1) motion, the Court "must construe the complaint liberally, treating all well-pleaded facts as true and drawing all reasonable inferences in favor of the plaintiffs."  *Viqueira v. First Bank*, 140 F.3d 12, 16 (1st Cir. 1998).  To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must state a plausible claim.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 555, 570.

## III.   DISCUSSION

Before engaging with the parties' arguments in the motions currently pending before the Court, the Court notes that the First Circuit has already opined on the jurisdictional challenges the Defendant raised in an earlier stage of Kenney and Jensen's cases.[5]  This Court dismissed both cases after concluding neither was ripe for adjudication.  *See Jensen v. R.I. Cannabis Control Comm'n*, 160 F.4th 18, 21 (1st Cir. 2025); *Kenney v. R.I. Cannabis Control Comm'n*, 160 F.4th 211, 212 (1st Cir. 2025).  The First Circuit disagreed with this conclusion, and "reverse[d] and remand[ed] for prompt consideration and resolution of the merits of plaintiff's claims of unconstitutionality of the Act and the claims for declaratory and injunctive relief against enforcement of the challenged provisions."  *Jensen*, 160 F.4th at 28; *see Kenney*, 160 F.4th at 212.  Now back before this Court, the Defendants once again

---

[5] Palmore commenced his action while Jensen and Kenney's cases were on appeal.  Dkt. 622, ECF No. 1 (complaint filed November 24, 2025).

urge this Court not to reach the merits since, in their view, each Plaintiff lacks standing to pursue their claims. *See* Dkt. 191, ECF No. 37 at 5–23; Dkt. 252, ECF No. 36 at 6–18; Dkt. 622, ECF No. 10-1 at 14–31. In addition to suggesting the Plaintiffs lack standing, the Defendants argue that the challenged conditions do not violate the Dormant Commerce Clause or Equal Protection Clause. The Court will address the likelihood of success of each claim in turn and will then turn to the remaining injunction factors—irreparable harm, balance of the equities, and public interest.

### A. Likelihood of Success

#### 1. Standing

To establish standing, the Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Beginning with Plaintiff Jensen, the Defendants argue she lacks standing because she failed to apply for an Adult-Use License or Social Equity Applicant Status Certification ("SEASC") during the Commission's current licensing process. Dkt. 191, ECF No. 37 at 7–15. They also claim that Plaintiff Jensen cannot fulfill the redressability prong, *id.* at 15–20, and that "there is no imminent, non-speculative risk that the Commission will apply the Challenged Provisions to Plaintiff in the future because there are currently no plans for a future licensing cycle." *Id.* at 20– 23. Meanwhile, as to Plaintiff Kenney, the Defendants state he lacks standing

11

"because he cannot show that [the Commission's] enforcement is likely to cause him any future injury." Dkt. 252, ECF No. 36 at 7–16. They argue that while Plaintiff Kenney submitted a SEASC application, unlike Jensen, it was deficient in certain respects, and so his application was denied. *Id.* at 12–14. Additionally, the Defendants claim Plaintiff Kenney faces a redressability problem because "an injunction would do nothing to remove the independent reasons [he] cannot obtain or compete for a license." *Id.* at 16–18. Lastly, as to Plaintiff Palmore, the Defendants state that he lacks standing because his previously submitted SEASC application was denied and because other, unchallenged provisions in the Act independently disqualify him from being eligible for a license. Dkt. 622, ECF No. 10-1 at 15–25.

The First Circuit has already foreclosed most of these standing arguments and clearly indicated that it, as Plaintiff Kenney writes in his brief, "wanted the actual merits of the Dormant Commerce Clause claim to be [] adjudicated." Dkt. 252, ECF No. 38 at 2. In *Jensen*, the Circuit explained:

> We reject defendants' argument that plaintiff lacks standing … Many of the reasons articulated as to why this case is ripe also go to why Jensen has standing … Jensen alleges she is ineligible to receive a Rhode Island retail cannabis license under the text of the Act. All parties would face needless burdens if the courts do not address the merits before licenses issued … Defendants are incorrect that Jensen lacks standing to challenge the constitutionality of the Act unless she has taken further steps to be eligible to apply, such as the purchase or lease of real estate with full zoning approval for the proposed cannabis establishment license, background checks, business disclosures, and plans pertaining to safety, security, and operations. Jensen is not required to incur these concrete costs to prepare an allegedly doomed application … Contrary to defendants' arguments, the party challenging the scheme can show [injury] only if he is able and ready to apply, but a plaintiff need not translat[e] his or her desire ... into a formal application where that application would be merely a futile gesture … We hold that Jensen has

12

> sufficiently alleged she is able and ready to apply for a Rhode Island retail cannabis license. Jensen is a cannabis entrepreneur who has applied for retail cannabis licenses in multiple other jurisdictions, including in partnership with other applicants. She seeks to apply for a license in Rhode Island, but the statute on its face allegedly makes her ineligible to receive a license. She is not required to engage in ... futile gesture[s] to establish standing.

160 F.4th at 26–27 (cleaned up); *see Kenney*, 160 F.4th at 212.  Acknowledging this directive, this Court rejects Defendants' standing arguments relating to Plaintiffs' failure to submit applications for SEASC or Adult-Use licenses.  Each Plaintiff has demonstrated here, and through their cannabis industry endeavors in other jurisdictions, that at this stage they are ready, willing, and able to apply.

Defendants' redressability arguments are also unavailing because, by granting the preliminary relief the Plaintiffs seek, the appropriate remedy will necessarily include restarting the licensing process with revised regulations.  This is of particular note because the CCC has not indicated that it plans to conduct additional licensing rounds in the future.  Reddish Decl., Dkt. 252, ECF No. 36-1, ¶¶ 12, 19.[6]  With those threads removed, Defendants' standing arguments unravels.

### 2. Dormant Commerce Clause

Moving on, the Court must consider whether Plaintiffs have shown a likelihood of success on their asserted Dormant Commerce Clause claims.  Defendants argue that the Dormant Commerce Clause does not apply to Rhode Island's recreational cannabis licensing laws (the Act) and suggest that even if the Dormant Commerce Clause applies, the Challenged Provisions are narrowly tailored to advance valid

---

[6] Michelle Reddish is employed by the CCC as Administrator of the Cannabis Office.  Reddish Decl, Dkt. 252, ECF No. 36-1, ¶ 2.

state interests. They further claim that the constitutional challenge fails because the CCC did not apply the Challenged Provisions "in a manner that discriminated against [Plaintiffs'] state[s] of residence." *See* Dkt. 191, ECF No. 37 at 24–38; Dkt. 252, ECF No. 36 at 19–32; Dkt. 622, ECF No. 10-1 at 28–44. Disagreeing, Plaintiffs appeal to the First Circuit's opinion in *Northeast Patient Group v. United Cannabis Patients and Caregivers of Maine*, 45 F.4th 542, 556 (1st Cir. 2022), which applied the Dormant Commerce Clause to Maine's medical marijuana licensing scheme and invalidated a similar residency requirement. Dkt. 191, ECF No. 9 at 17–27; Dkt. 252, ECF No. 38 at 8–10; Dkt. 622, ECF No. 12 at 23–24.

Plaintiffs are correct that *Northeast Patients Group* controls and compels a finding that the Dormant Commerce Clause applies to the Act. In that case, the Circuit specifically addressed "whether the Maine Medical Use of Marijuana Act … violates what is known as the dormant Commerce Clause of the United States Constitution by requiring officers and directors of medical marijuana dispensar[ies], [] operating in Maine to be Maine residents." *Id.* at 544 (internal quotes and citations omitted). In affirming the district court's grant of a preliminary injunction, the Circuit explained "that nothing in the record in this case indicates that, due to the [Controlled Substances Act], there is no interstate market in medical marijuana." *Id.* at 547. The Court went on to explain that "further undermin[ing] the notion that no such market exists" is the Rohrabacher-Farr Amendment. *Id.* at 547–48. That Amendment bars the Department of Justice from interfering with state laws on medical marijuana.

14

However, that the case dealt with medical marijuana rather than recreational marijuana, and discussed the Rohrabacher-Farr Amendment, are far from compelling reasons to reject the Circuit's clear conclusion as binding precedent, as the Defendants implore of this Court. *See generally id.* The following discussion from *Northeast Patients Group* about the medical marijuana market is equally true if replaced with "recreational marijuana market" and applied to the Challenged Provisions in the Act:

> [N]othing in the record in this case indicates that, due to the CSA, there is no interstate market in medical marijuana. The prohibition that Maine's Medical Marijuana Act seeks to impose on out-of-state actors entering that very market reflects the reality that the market continues to operate. That prohibition even indicates that the market is so robust that, absent the Medical Marijuana Act's residency requirement, it would be likely to attract entrants far and wide. And, while the Medical Marijuana Act does attempt to restrict out-of-staters from selling marijuana, it affirmatively encourages out-of-staters to participate in the medical marijuana market as customers.

*Id.* at 547. The Circuit's focus on the *market* aligns with the purpose of the Dormant Commerce Clause which is to prevent state economic protectionism. *See id.* at 546 (stating the Dormant Commerce Clause "in and of itself protects interstate commerce from 'the evils of economic isolation and protectionism' that state regulation otherwise could bring about") (quoting *City of Phila. v. New Jersey*, 437 U.S. 617, 624 (1978)). Considering that the CCC "received multiple SEASC applications submitted by out-of-state individuals and entities" and has "certified multiple out-of-state residents … as approved social equity applicants[,]" the existence of an interstate market in recreational cannabis is clear. Reddish Decl., Dkt. 191, ECF No. 37-1 ¶¶ 15–16.

Rather than rely on binding First Circuit precedent, the Defendants urge this Court to follow the Ninth Circuit's decision in *Peridot Tree WA, Inc. v. Wash. State Liquor and Cannabis Control Bd.,* which held that the Dormant Commerce Clause did not apply to state restrictions on interstate market for marijuana. 162 F.4th 1179, 1190 (9th Cir. 2026). While respecting that Circuit's differing approach, that discussion is largely based on the dissents penned in *Northeast Patients Group* and *Variscite N.Y. Four, LLC v. N.Y. State Cannabis Bd.*, 152 F.4th 47 (2d Cir. 2025). As the Ninth Circuit explained,

> There is force to the argument that through the CSA, Congress expressed an intent to permit protectionist state regimes that restrict interstate commerce in marijuana, and that the usual test for assessing this congressional intent should be relaxed when Congress has made the good in question illegal. *See Variscite N.Y. Four*, 152 F.4th at 67–70 (Livingston, C.J., dissenting); *Northeast Patients Grp.*, 45 F.4th at 559 (Gelpí, J., dissenting)). But we conclude as an antecedent matter that the dormant Commerce Clause need not be extended to facilitate interstate commerce that is illegal under federal law.

*Peridot Tree WA, Inc.*, 162 F.4th at 1188. This Court is not persuaded that the case before it is sufficiently dissimilar to the issue considered in the First Circuit's *Northeast Patients Group* such that it can disregard the majority opinion, which clearly concluded the Dormant Commerce Clause applies. Therefore, the Court concludes the Dormant Commerce Clause applies to the recreational cannabis market.

Defendants' next argument is that the Challenged Provisions do not violate the Dormant Commerce Clause because they are narrowly tailored to advance valid state interests. Dkt. 191, ECF No. 37 at 30–35; Dkt. 252, ECF No. 36 at 25–30; Dkt. 622,

16

ECF No. 10-1 at 38–44; *see Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) ("A discriminatory law is virtually *per se* invalid … and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.") (internal quotations and citations omitted). The specific valid state interests advanced by the Defendants in support of the Act are (1) health and safety, (2) that requiring a bare majority of ownership and control of cannabis retail licenses by in-state residents ensures that the Commission will possess meaningful authority, jurisdiction, and oversight over all retail license holders, and that (3) a partial residency requirement also advances R.I.'s legitimate interest in minimizing conflict with federal law and law enforcement priorities. Each asserted interest is rejected.

Relating to health and safety, Defendants argue that since cannabis is illegal, the state achieves a safe and healthy regulation of the cannabis industry by monitoring cultivation and the subsequent distribution to dispensaries. *See, e.g.*, Dkt. 191, ECF No. 14-1 at 11–12. A partial residency requirement has no impact on the State's ability to continue tracking marijuana cultivation and distribution, especially considering Plaintiffs do not challenge any restriction on cannabis products crossing state lines. *See, e.g.*, Dkt. 191, ECF No. 38 at 19. The same is true for Defendants' argument that it has an interest in requiring each licensee to undergo a national criminal background check. Dkt. 191, ECF No. 14-1 at 13.

Next, the Defendants contend that the residency requirement is necessary to make sure the CCC has "meaningful authority, jurisdiction, and oversight over all

17

retail license holders." *See, e.g.,* Dkt. 191, ECF No. 37 at 31. Similar to the asserted health and safety state interest, whether an out-of-state person owns—individually or through a company—49%, 51%, or 100% of a dispensary has no relation to the CCC's ability to exercise its authority and oversight over the dispensary. The CCC can exercise its lawful authority over the dispensary, and the license holder will be required to comply with all State laws and all of the CCC's rules and regulations.

The last asserted State interest that the Defendants put forward in support of the residency requirement is that it advances Rhode Island's interest in minimizing conflict with federal law and law enforcement priorities. *See, e.g.,* Dkt. 191, ECF No. 37 at 32. In support of this argument, Defendants point to the Department of Justice's Cole Memo which identified preventing "the diversion of marijuana from states where it is legal under state law in some form to other states" as a DOJ enforcement priority.[7] This Memo is of no consequence relative to this justification for two reasons. First, Attorney General Sessions repealed the Memo in 2018. Second, the residency restrictions are unrelated to enforcing laws against trafficking marijuana across state lines which is still prohibited under the Controlled Substances Act and can still be prosecuted by DOJ. The Court finds the residency requirement is not narrowly tailored to advance valid state interests and Defendants' arguments fail.

---

[7] The Cole memo was issued by Deputy Attorney General James Cole in 2013. https://perma.cc/SS5Z-Q8YL. It instructed the Department of Justice to not enforce federal marijuana prohibition in states that enacted laws legalizing marijuana. The memo was rescinded in 2018 by Attorney General Jeff Sessions. https://perma.cc/6LQD-NBF3.

Defendants' last attempt at convincing this Court that the Challenged Provisions do not violate the Dormant Commerce Clause is that the CCC did not apply the challenged social equity criteria in a discriminatory fashion. This argument can be summarily dismissed because, as the First Circuit made clear in *Jensen*, "[t]he Commission's licensing rules and regulations had to conform to the same restrictions in the statute[.]" 160 F.4th at 25 (citing *In re Advisory Op. to Governor*, 627 A.2d 1246, 1248 (R.I. 1993)). Here, the CCC's Rules and Regulations, 560-RICR-10-10, conform with, and are identical to, the statutory language in R.I. Gen. Laws § 21-28.11, *et seq.* Those regulations and statutes require the CCC to apply and enforce the residency requirement and social equity provisions as written. This means, for example, that for social equity applicants, out-of-state convictions cannot be considered in place of in-state convictions because the regulations and statutory language explicitly require the conviction to be "eligible for expungement under this chapter." *See, e.g.*, R.I. Gen Laws § 21-28.11-3(39)(ii)(A), (iii)(B). The CCC will not be free to disregard the clear language of the statute and regulations, and therefore this argument is rejected.

\* \* \*

Given the above, the Court finds that all Plaintiffs have shown a likelihood of success on the merits of their Dormant Commerce Clause claims. The Court will now turn to whether Plaintiffs Kenney and Palmore have sufficiently pled a violation of the Equal Protection Clause or if that claim should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

### 3.    Equal Protection Clause

Defendants argue that Plaintiffs' equal protection claim fails on the merits because Certification Criterion 1—references to disproportionately impacted areas ("DIAs")—passes constitutional muster under rational basis review.  Dkt. 191, ECF No. 37 at 38.  Defendants explain that the State's decision to include residence in a DIA as one of the criteria for social equity status is a plausible means the State could adopt to advance the legitimate goal of "reduc[ing] barriers to ownership and/or participation in the cannabis industry for individuals and communities most adversely impacted by the enforcement of cannabis-related laws[.]"  *Id.* at 38.  They argue this is especially true considering the General Assembly's legislative findings on the relationship between the adverse impact of the enforcement and financial barriers to participation in the State's cannabis industry.  R.I. Gen. Laws § 21-28.11-31(a).  In response, Plaintiffs point out that 4 of the 5 criteria for a DIA have nothing to do with cannabis, and the fifth requires the *area* where the applicant lived to have a high rate of cannabis arrests compared to other areas.  *See* R.I. Gen. Laws § 21-28.11-3(23)(i)–(iv) (relying on the following criteria to define DIAs: (1) federal decennial census, (2) children in the free lunch program as determined by the Rhode Island board of education, (3) SNAP, and (4) unemployment rate as determined by Rhode Island department of labor and training).

As Plaintiff Jensen explains in her brief, "a person who has suffered no harms from the illegality of cannabis can qualify for the social equity program if the person lives in an area where the individual's neighbors have a poverty rate of 20%.  Similarly, a person who suffered no harms from the illegality of cannabis can qualify

for the social equity program if 75% of school children qualify for free lunches." Dkt. 191, ECF No. 38 at 24. This, according to Plaintiffs, shows that these statutes are overinclusive, underinclusive, arbitrary and capricious, not related to the legislature's goals, and cannot survive rational basis review. A district court in Michigan examined this issue and explained:

> [D]efendant has failed to show that its stated goal of assisting those who have been harmed by the War on Drugs is advanced by reserving fifty percent or more of the recreational marijuana licenses for those who have lived in Detroit for at least ten years. Certainly, many people who have lived in Detroit for this period of time, or longer, have not been burdened with a marijuana-related arrest or conviction. And just as certainly, many people who have lived in Detroit for fewer than ten years have been significantly burdened by such an arrest or conviction. Giving "social equity" preference to the former group while denying it to the latter is irrational. It is also irrational to grant the preference to residents of Detroit but deny it to those of other communities, such as neighboring River Rouge, when residents of both cities presumably suffered from the War on Drugs to the same extent.

*Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 816 (E.D. Mich. 2021). This Court agrees, especially for purposes of satisfying the Rule 12(b)(6) standard. Applied to the cases before this Court, allowing an individual to be eligible for the social equity licensing program if they suffered no harm from cannabis criminal laws but lived in a certain area, yet making another individual ineligible if they suffered harm from cannabis criminal laws but lived in a different area, would likely fail to survive rational basis scrutiny. At this stage in the litigation, Plaintiffs Kenney and Palmore have established a likelihood of success on the merits of their equal protection claims.

 * * *

21

Therefore, the Defendants' motions to dismiss are denied as to each of the three Plaintiffs because the Plaintiffs have established plausible claims that the Act violates the Dormant Commerce and Equal Protection Clauses. The Court will proceed to examine the remaining preliminary injunction factors.

### B.    Irreparable Harm

"[T]he measure of irreparable harm is not a rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009). Much of the Defendants' arguments against irreparable harm stem from Plaintiff Jensen's failure to apply for an Adult-Use license or SEASC certification, and Plaintiffs Kenney and Palmore's purported deficient and rejected applications— arguments the Court rejected above when discussing standing. *See* Dkt. 191, ECF No. 38 at 39–32. Meanwhile, Plaintiffs assert several irreparable harms that would occur unless the Court enjoins Defendants from issuing Licenses under the application program and orders the CCC to restart the process.

Plaintiffs suggest that "a constitutional violation causing monetary loss that is not easy to quantify is an irreparable harm." *See, e.g.*, Dkt. 191, ECF No. 9 at 32–33. The First Circuit has "recognized that some economic losses can be deemed irreparable. For instance, 'an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business." *Vaqueria Tres Monjitas, Inc.*, 587 F.3d at 485 (quoting *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995)). This coincides with Plaintiffs' claims that delay in entering the market causes irreparable harm because all

22

advantages to early entrants in the market, such as access to customers who have not developed loyalty to other businesses, will have been claimed.  The Maine District Court acknowledged this harm with the following thoughtful explanation:

> I agree that the unique context of this new market suggests that the timing of a ruling in the Plaintiffs' favor is particularly important. The Plaintiffs are not seeking to enter an established [cannabis] market, where the significance of any further delay in their participation is likely diminished. Rather, the Plaintiffs are seeking to be in the first wave of [cannabis] licensees as a new market launches and are hoping to attract customers who have not yet developed allegiances.

*Northeast Patients Group, LLC v. City of Portland, Me.*, No. 2:20-cv-00208-NT, 2020 WL 4741913, at *11 (D. Me. Aug. 14, 2020).  This Court agrees that Plaintiffs face irreparable harm through delay in entering a market where only 24 new licenses will be issued statewide.  Because there are a finite number of licenses and dispensaries, Plaintiffs will suffer the same harms as the plaintiff in *Northeast Patients Group* if they are not given the opportunity to enter the market at the same time as other applicants.  *See* 2020 WL 4741913, at *11.

Moreover, Plaintiffs' concern that they will be excluded from the R.I. Adult-Use recreational cannabis market absent injunctive relief because the CCC intends to issue only 24 licenses is well-founded, especially because the Defendants admit that the CCC has no plans for future Adult-Use or social equity license application rounds.  *See, e.g.,* Dkt. 191, ECF No. 37 at 41.

In sum, considering the Plaintiffs' strong likelihood of success on the merits, the Court finds Plaintiffs have shown that they will suffer irreparable injury absent injunctive relief.  *See Vaqueria Tres Monjitas, Inc.*, 587 F.3d at 485.

23

### C.    Balance of Equities & Public Interest

When the Government is the opposing party, the balance of the equities and weighing the public interest factors are considered together. *Mills*, 16 F.4th at 37. The combined consideration requires the Court to weigh "the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)), "pay[ing] particular regard for the public consequences in employing the extraordinary remedy of injunction," *id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

Relying on a case out of the Seventh Circuit Court of Appeals, the Defendants argue that "any interest Plaintiff[s] could conceivably have in disrupting the current licensing process at the eleventh hour would still be 'vastly outweighed by the severe harm to the reliance interests' of third-party applicants 'and to the public's interest in the orderly completion of the [current] licensing process.'" *See, e.g.*, Dkt. 191, ECF No. 37 at 43–46 (quoting *Finch v. Treto*, 82 F.4th 572, 579 (7th Cir. 2023)). Detrimental to Defendants' reliance on *Finch v. Treto* is that the district judge in that case denied the plaintiff's request for a preliminary injunction, "conclud[ing] that [plaintiffs] waited far too long to file their suit—more than two years after the application deadline for the first batch of licenses and eight months after the lottery results were announced."[8] 82 F.4th at 577. "[T]he judge reasoned that halting and

---

[8] The district court in *Finch* considered whether provisions in the Illinois Cannabis Act violated the dormant commerce clause. As explained by the Seventh Circuit:

unwinding the 2021 licensing process would cause undue harm to the holders of the allocated conditional licenses … [T]he judge declined to enjoin the finalization of the 2021 licenses, finding the request for preliminary injunctive relief too 'sweeping' and 'highly disruptive.'" *Id.*

The Defendants' contention that Plaintiffs are disrupting the current licensing process at the eleventh hour carries no merit because Plaintiffs Jensen and Kenney filed their cases in 2024, with Ms. Jensen requesting injunctive relief on June 10, 2024—months before the CCC adopted the Rules and Regulations. Dkt. 191, ECF Nos. 1, 9; Dkt; Dkt. 252, ECF No. 1. Here, "the Commission expects to make final determinations regarding which applications are qualified for the license lottery in May 2026, and to hold the lottery shortly thereafter," Dkt. 252, ECF No. 35 at 2, so the comparison to *Finch* is misplaced. Further, knowing the Act was facing legal challenges in this Court, the CCC continued forward with its plan to implement the Act and its licensing scheme. The resulting fall-out will be, to be blunt, self-inflicted.

---

In an exhaustive opinion, the judge concluded that the plaintiffs had established a likelihood of success on their claim that the residency provisions in the state's licensing regime could not survive constitutional scrutiny under the Supreme Court's dormant Commerce Clause jurisprudence. She acknowledged, however, that the issue was murky and unsettled because federal law continues to prohibit cannabis distribution. The judge also held that the plaintiffs had established, "at least in theory," that they would suffer irreparable harm in the absence of preliminary injunctive relief.

82 F.4th at 577. That court also declined to enjoin a future licensing process "[b]ecause the proposed administrative rule governing the 2022 licenses was not yet final and the residency provisions might be modified or deleted [so] the judge concluded that the plaintiffs' constitutional challenge was unripe." *Id.*

Finally, the Court is mindful that there are applicants who have paid application fees, secured leases, and expended resources in support of their applications. Indeed, Defendants have clearly argued that "each of the 98 third-party applicants was required to expend significant investments in time, effort, and financial resources. An order delaying the Commission from issuing Licenses altogether would unfairly and materially prejudice those third-party applicants." *See, e.g.*, Dkt. 191, ECF No. 37 at 44. These interests, however, are outweighed by the Plaintiffs' complete exclusion from the market, which is what would occur if the CCC is allowed to proceed with the licensing program under the current Act and regulations. The CCC can remedy or minimize some of the third-party harm by, for example, refunding application fees or transferring current applications to the new application period.

While the balance of the equities is a closer call for this Court than the likelihood of success on the merits or the irreparable harm analyses, the Court concludes that the equities and public interest weigh in favor of granting injunctive relief.

## IV.    BOND

The Defendants suggest bond is appropriate to cover "the costs State Defendants have expended in its journey to promulgate rules and regulations in accordance with the Cannabis Act." *See, e.g.*, Dkt. 191, ECF No. 14-1 at 21. Plaintiffs argue against an injunction bond because they are individuals and are seeking to vindicate constitutional rights. *See, e.g.*, Dkt. 191, ECF No. 9 at 36. Under the

Federal Rules of Civil Procedure Rule 65(c), "[t]he court may issue a preliminary injunction … only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Here, the Defendants have failed to explain with any particularity the costs they expended to, essentially, do their job.  Considering this lack of evidence in the record, the Court will exercise its "substantial discretion" and will not require Plaintiffs to post an injunction bond. *See Int'l Ass'n of Machinists and Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991) (explaining that "there is ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond")

## V.    ORDER

The Plaintiffs' motions for preliminary injunction (Dkt. 191, ECF No. 9; Dkt. 252, ECF No. 34) are GRANTED.  The Defendants are Enjoined from enforcing R.I. Gen Laws. § 21-28.11-3(3), § 21-28.11-3(23), § 21-28.11-3(34), § 21-28.11-3(39), and § 21-28.11-10.2(b)(2) and the corresponding Rules and Regulations adopted by the Cannabis Control Commission.   Further, the Defendants are Enjoined from proceeding with the current application or licensing period, including (1) holding the lottery to select applicants, and (2) processing any applications submitted under the current licensing period, for both Adult-Use and Social Equity licenses.

27

## VI.    CONCLUSION

Based on the reasons set forth above, the Plaintiffs' motions for a preliminary injunction are GRANTED and Defendants' motions to dismiss (Dkt. 191, ECF No. 13; Dkt. 252, ECF Nos. 12, 19; Dkt. 622, ECF No. 10) are all DENIED.

IT IS SO ORDERED.

Melissa R. DuBose
United States District Judge

04/08/2026

28